In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-3671

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

*Plaintiffs*,

and

TOBY T. WATSON,

*Plaintiff-Appellant*,

*v.*

JENNIFER KING-VASSEL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-CV-236 — **J. P. Stadtmueller**, *Judge.*

ARGUED APRIL 25, 2013 — DECIDED AUGUST 28, 2013

Before MANION and KANNE, *Circuit Judges*, and LEE, *District Judge.*[*]

KANNE, *Circuit Judge.* After acquiring the medical records for N.B., a minor, Dr. Toby T. Watson initiated this *qui tam* False Claims Act suit against N.B's former treating psychiatrist, Dr. Jennifer King-Vassel. While in King-Vassel's care, N.B. received Medicaid assistance that covered N.B.'s prescription drug costs. Watson alleged that several of King-Vassel's off-label prescriptions to N.B. constituted false claims submitted to the United States government. The district court entered summary judgment in favor of King-Vassel due to Watson's failure to name expert witnesses. The court determined that expert testimony was required to prove essential elements of his case. Disagreeing with the district court's conclusion, we reverse.

## I. BACKGROUND

Dr. Toby T. Watson placed an advertisement in a Sheboygan, Wisconsin, newspaper soliciting minor Medicaid patients who had been prescribed any of a number of psychotropic medications. He placed the ad after researching *qui tam* actions and meeting the President of the Law Project for Psychiatric Rights (not coincidentally, the attorney who represented Watson before this court). Watson's ad offered the opportunity to "participate in a possible Medicaid fraud suit" and to share in any recovery from the litigation.

---

[*] Of the Northern District of Illinois, sitting by designation.

N.B.'s mother—Christine Maxwell Meyer—responded to the advertisement and eventually entered into an agreement with Watson to share the proceeds from the potential lawsuit. Though Watson had never treated, or apparently even met, N.B., Meyer agreed to procure a copy of N.B.'s medical records to facilitate the lawsuit. Toward this end, Meyer addressed to King-Vassel a signed authorization to disclose N.B.'s treatment records. The authorization stated that Meyer was requesting the records "[f]or the purpose of providing psychological services and for no other purpose whatsoever … ." (R. 42-1 at 7.) The authorization did not mention litigation or any possible Medicaid fraud suit. (*Id.* at 7-8.)

Rather than providing psychological services to N.B., however, Watson combed the records for so-called "off-label" prescriptions. An "off-label" prescription is one written for a purpose that has not been approved by the Food and Drug Administration ("FDA"). These purposes can, and often will, find support in scientific literature, but, for whatever reason, the drug's manufacturer either has not, or has not yet, gone through the FDA approval process for that specific use. Once a drug has been approved for one use, however, the FDA cannot prevent physicians from prescribing the drug for other uses. *Cf. Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 349-50 (2001) (discussing the parallel situation of off-label medical device use); *see also United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 44 (D. Mass. 2001). Indeed, off-label prescriptions by physicians are quite common. Randall S. Stafford, *Regulating Off-Label Drug Use—Rethinking the Role of the FDA*, 358 New Eng. J. Med. 1427, 1427 (2008). The legality of the prescription, however, does not answer

questions such as whether an individual off-label prescription is medically reasonable (generally a question for a medical malpractice suit) or whether the government is obligated to pay for a Medicaid patient's off-label prescriptions (a practice that Watson is attempting to police in this case). Unsurprisingly, given the ubiquity of off-label prescriptions, Watson found off-label prescriptions in N.B.'s medical record.

King-Vassel treated N.B. between 2004 and 2008 and prescribed a number of psychotropic medications. Watson identified forty-nine individual prescriptions that he alleged constituted false claims to the United States government. Under the applicable interlocking provisions of the False Claims Act and laws governing Medicaid, the federal government generally will not pay for medications prescribed for purposes not approved by the FDA or "supported" by any of several pharmaceutical reference books (called "compendia"). Watson theorized that the forty-nine prescriptions fit that description and filed suit in the Eastern District of Wisconsin against King-Vassel (as well as several other parties who have been dismissed) under the *qui tam* provision of the False Claims Act ("FCA"). Although the Department of Justice declined to intervene in the suit (as is its right in a *qui tam* action, though often indicative of a lower chance of success), Watson pressed ahead with the case.

On July 16, 2012, King-Vassel moved for summary judgment. King-Vassel's summary judgment motion focused on two primary issues: whether Watson had "direct and independent knowledge" of the alleged Medicaid fraud (a prerequisite for *qui tam* standing), (R. 29 at 5), and whether the fraud allegations were based on publicly available information (a

disqualifying factor for a *qui tam* FCA suit), (*id.* at 10). At the very end of her supporting brief, King-Vassel included a short, two-paragraph section arguing that the case should "be dismissed with prejudice" because Watson had failed to name an expert who could "discuss, among other things, how claims for reimbursement for medications are presented to Medicaid programs, and how payments are made by those Medicaid programs." (*Id.* at 15.)

Watson's brief in opposition to the summary judgment motion focused on the two primary issues that King-Vassel identified. (R. 42 at 2-6.) Watson also responded to the argument about expert testimony by arguing (1) that experts should not be required to explain the Medicaid payment system; and (2) that experts would not be required to explain the pharmaceutical aspects of the case (which relate, for reasons described below, to whether the claims would truly be "false" within the meaning of the FCA). (R. 42 at 6-8.) Again, this issue did not factor heavily in the briefing.

The district court ruled against King-Vassel on her primary summary judgment arguments. *United States ex rel. Watson v. King-Vassel*, No. 11-CV-236, 2012 WL 5272486, *3-*5 (E.D. Wis. Oct. 23, 2012). However, the court also analyzed both strands of the failure to name an expert argument—that an expert would be needed to explain Medicaid (King-Vassel's argument) and that an expert would be required to explain some of the pharmaceutical data (which only appeared in Watson's opposition brief). *Id.* at *5-*8. The court held that Watson's failure to name an expert for *either* reason entitled King-Vassel to summary judgment. *Id.* Watson timely filed this appeal. (Dkt. 1.)

## II. ANALYSIS

The district court granted summary judgment for King-Vassel on the issue of whether Watson was required to present expert witnesses with regard to two distinct parts of his case: (1) the Medicaid claim process, and (2) whether the claims Watson sued over were "false" within the meaning of the False Claims Act. Both of these issues are intimately entangled with the operation of the False Claims Act and Medicaid. Thus, we think a brief description of both will be helpful to the reader. We will proceed to address the issues in the order the district court analyzed them—the Medicaid process first, followed by the falsity of the claims—and delve deeper into Medicaid and the FCA at the appropriate times. For the reasons detailed below, we disagree with the district court's entry of summary judgment.

The False Claims Act makes it unlawful for a person to "knowingly present[ ], or cause[ ] to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). The Act establishes civil penalties for those who violate its terms; the penalties range from $5,000 to $10,000, "plus 3 times the amount of damages which the Government sustains." 31 U.S.C. § 3729(a)(1)(G). Although the Attorney General can enforce these provisions, the Act also provides for enforcement through the empowerment of "private attorneys general." *Stalley v. Methodist Healthcare*, 517 F.3d 911, 917 (6th Cir. 2008). The FCA allows for these private citizens, called relators, to bring *qui tam* suits against alleged fraudsters on behalf of the United States government. 31 U.S.C. § 3730. The United States may, if it chooses, intervene in these suits, 31 U.S.C. § 3730(b)(2), or, if

the United States declines, as happened in this case, the relator may then prosecute the case on his own (although still technically on behalf of the United States). 31 U.S.C. § 3730(c)(3). Under either option, if the prosecution of the alleged fraudster is successful, the relator can receive a substantial award for bringing the false claim to light. 31 U.S.C. § 3730(d)(1)-(2); *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 727 (7th Cir. 2006).

Medicaid provides "medical assistance on behalf of families with dependent children and of … individuals[ ] whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. Although the federal government ultimately foots much of the bill, the administration of the program is left to the states. In the case of prescription drugs, pharmacies pay pharmaceutical companies for drugs and then submit claims to the state Medicaid agency for reimbursement. 42 U.S.C. §§ 1396a(a)(23), (32). The federal government then reimburses the state. 42 U.S.C. § 1396-1. In that way, claims submitted to state Medicaid agencies are considered claims presented to the federal government and may serve as the basis for FCA liability. *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (discussing the necessity of an actual claim to Medicaid as a basis for FCA liability).

With that bit of background out of the way, we proceed to the specifics of this case, which is before us on an appeal of the entry of summary judgment. "We review a district court's grant of summary judgment *de novo*, drawing all reasonable inferences and viewing all facts in favor of the non-moving party." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013)

(citation omitted). A district court should dispose of an issue on summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, "the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012). The moving party may seek summary judgment on the ground that the non-moving party has no evidence to support a claim. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006); *see also Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011).

The district court held that Watson's failure to name expert witnesses meant that his evidence was insufficient to establish an essential element of his case. *King-Vassel*, 2012 WL 5272486, at *7. Expert testimony may be required for matters that are beyond the common understanding of a lay juror. *Cf. Smith v. Hunt*, 707 F.3d 803, 809 (7th Cir. 2013) (expert testimony on basic relationship between opiates not required because it would be "within the ken of the average juror");

*United States v. McGee*, 408 F.3d 966, 978 (7th Cir. 2005) (expert testimony not required because drug trafficking and related gang violence were within "the ken of the average juror"). The district court thought that the issues implicated by Watson's complaint were necessarily beyond the common understanding of a lay juror. Below we explain why that was not the case.

*A. Failure to Name a Medicaid Expert*

The district court erred in granting summary judgment to King-Vassel on the basis of Watson's failure to identify a Medicaid expert. To reach its conclusion, the district court began its analysis by describing the Medicaid process as a "black box" and the process of submitting claims as a "grand mystery." *King-Vassel*, 2012 WL 5272486, at *7. The district court reasoned that, because Watson did not identify an expert to explain these mysteries, Watson could not prove that King-Vassel caused the submission of any allegedly false claims, much less that she did so knowingly. Therefore, the district court concluded, Watson's claim did not meet essential elements of the FCA (that a person "knowingly … cause[ ]" a false claim). Our disagreement with the district court stems from its overly rigid interpretations of both prongs of the knowing causation requirement: the FCA's state of mind element ("knowingly") and the prerequisite that the defendant have actually caused the submission of the false claim. We will begin with the former.

*1. Dr. King-Vassel's state of mind*

Although the FCA uses the seemingly straightforward word "knowingly," the statute's state of mind element is actually quite nuanced. To establish liability under the FCA,

the defendant must have acted with "actual knowledge," *or* with "deliberate ignorance" or "reckless disregard" to the possibility that the submitted claim was false. 31 U.S.C. § 3729(a)(1)(A), (b). Therefore, while "[i]nnocent mistakes or negligence are not actionable under [the FCA]," *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011) (citation omitted), the statute does not require a "specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B). We will focus primarily on the third mental state—"reckless disregard"—as it is the most capacious of the three.

Though the FCA has contained the "reckless disregard" language for almost thirty years, *see United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012), we have not found the need to define it with any more specificity than to say that it does not encompass "[i]nnocent mistakes or negligence," *Yannacopoulos*, 652 F.3d at 832. Congress and our sister circuits have provided some assistance, however. Congress added "reckless disregard" to the FCA in 1986. *Renal Care Grp.*, 696 F.3d at 530. The Senate Report that accompanied that change evinced an intent to hold liable "[o]nly those who act in gross negligence," that is, those who failed "to make such inquiry as would be reasonable and prudent to conduct under the circumstances." S. Rep. No. 99–345, at 20 (internal quotations omitted), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5285. One of our sister circuits has described reckless disregard in the FCA context as "an extension of gross negligence" or an "extreme version of ordinary negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997). This description tracks Black's definition that a person acts with reckless disregard "when the actor knows or has

reason to know of facts that would lead a reasonable person to realize" that harm is the likely result of the relevant act. *Black's Law Dictionary* 540-41 (9th ed. 2009). We think these all are apt and useful descriptions of the concept of reckless disregard.

And here, based on those descriptions, we think that the district court was incorrect to hold that Watson could not, without an expert, "establish that King-Vassel had any knowledge whatsoever of the likelihood of submission of a fraudulent claim." *King-Vassel*, 2012 WL 5272486 at *6. Watson need only show that King-Vassel had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim (per Black's) or that King-Vassel failed to make a reasonable and prudent inquiry into that possibility (per the Senate report). We think that Watson did so.

Specifically, Watson presented an affidavit from Christine Maxwell Meyer—N.B.'s mother—that asserted several facts that, if believed, could lead a rational jury to find that King-Vassel showed reckless disregard to the existence of a potentially false claim. For instance, Meyer affied that she had provided King-Vassel with N.B.'s Medicaid information. (R. 44 at 2.) Meyer further testified that she had never paid out of pocket for N.B.'s appointments with King-Vassel, and that King-Vassel had never "suggested that she had not billed Medicaid for her services to N.B." (*Id.*) Relating to the prescriptions, Meyer testified that she "always used [her] medical assistance card to pay for N.B.'s medications" at the Wal-Mart pharmacy where the prescriptions were filled. (*Id.*) Watson additionally presented records from Wal-Mart that supported these claims. (R. 46-3.) And, Watson presented paperwork that

seemed to indicate King-Vassel had been compensated by the Medicaid program for her prescriptions to N.B. (R. 46-4) (describing one of the services King-Vassel was paid for as "Medication Management").

We would not describe any of these pieces of evidence as irrefutable proof of King-Vassel's state of mind. And it is certainly the case that an expert's testimony on Medicaid billing practices or standard doctor's office procedure could make Watson's case stronger. But including expert testimony would no doubt make many cases stronger. We do not think, however, that King-Vassel's state of mind is beyond the common understanding of the lay juror. A reasonable jury could plausibly interpret the evidence Watson assembled to show that King-Vassel recklessly disregarded the fact that N.B. received Medicaid assistance,[1] and that claims for payment for his prescriptions would be submitted to Medicaid. Entry of summary judgment on this basis was therefore incorrect.

---

[1] Meyer stated in the affidavit that "Dr. King knew that N.B. was on Medicaid and knew that his care was being paid for by Medicaid." (R. 44 at 2.) King-Vassel argues that this was speculation and beyond Meyer's personal knowledge. (Appellee's Br. at 17.) We agree with King-Vassel on this point, and so do not rely on this particular statement to reach our conclusion. Nevertheless, the affied-to facts within the scope of Meyer's personal knowledge—that Meyer had supplied King-Vassel with N.B.'s Medicaid information and had never paid out of pocket, for instance—could give rise to the conclusion that King-Vassel had reason to know N.B.'s Medicaid status.

*2. Proximate cause*

The district court also determined that summary judgment was proper because of what it described as "a proximate-cause problem for Dr. Watson." *King-Vassel*, 2012 WL 5272486, at *7. That is, the court described Medicaid as such a complicated, arcane system that, without an expert to properly explain it, Watson could not prove that King-Vassel's writing of a prescription would actually cause the submission of a claim to Medicaid. Again, we do not think that this was an appropriate basis for summary judgment.

Under Watson's theory of the case, FCA liability extends to those persons or entities who actually cause the submission of a false claim to the United States government. 31 U.S.C. § 3729(a)(1)(A). Thus, an action that breaks the chain of causation would relieve a defendant of liability. Debates over proximate cause are certainly familiar to American civil jurisprudence. *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928); *see also United States v. Laraneta*, 700 F.3d 983, 990-91 (7th Cir. 2012); *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 214-15 (7th Cir. 2011). Generally, however, reasonably foreseeable intervening forces will not break the chain of proximate causation. *See, e.g.*, *Laraneta*, 700 F.3d at 990 (citation omitted) (giving the conventional definition of proximate cause as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred"); *see also* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44, at 303-04 (5th ed. 1984) ("The courts are quite generally agreed that [foreseeable intervening forces] will not supersede the defendant's responsibility.");

Restatement (Second) of Torts § 443 (1965) ("The intervention of a force which is a normal consequence of a situation created by the actor's … conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."). Here, we think the potential intervening factors that the district court identified, as well as those it described as constituting "a grand mystery," are not so unforeseeable as to break the chain of causation.

We are not precisely certain what the district court meant when it described Medicaid as follows:

> [T]here is a grand mystery between the time of the prescription and the claim being made to Medicaid. In many ways, that mystery is like a black box—perhaps Dr. King-Vassel's signature on the prescription set off a series of reactions that on the other side of the box resulted in a false claim, but the churning mechanism on the inside is still a mystery.

*King-Vassel*, 2012 WL 5272486, at *7. To be sure, the statutes and regulations describing the Medicaid process are dense, *see, e.g.*, 42 U.S.C. § 1396, *et seq.*, and 42 C.F.R. § 430.0, *et seq.*, but, at least in theory, they are accessible to every member of the public. Regardless, we do not think that the Medicaid process itself creates the "proximate cause problem" that the district court identified. Certainly there are intervening events—the patient actually filling the prescription at a pharmacy is a baseline requirement, and no doubt various clerks push various papers to ensure that the claim proceeds through proper channels. But these events strike us as eminently

foreseeable forces that will occur without fanfare in the vast majority of cases. Rather than some sort of Rube Goldberg contraption hidden under cover, we think a more apt analogy for the Medicaid process is an automobile: while most people could not explain every step between key-turn and ignition, the cause-effect relationship is commonly appreciated. An expert might be required in some cases to explain the process (of both Medicaid and the car), but not to testify about the existence of the relationship. We think that, absent some affirmative evidence that King-Vassel's prescriptions did not cause a claim to be filed, Watson should have been able to rely on traditional, time-tested notions of causation to overcome summary judgment. In short, we do not think a jury needs expert testimony to understand that writing a prescription to a person insured by Medicaid will likely cause a claim to be filed with Medicaid.

## B. Failure to Name a Medical Expert

The district court also faulted Watson for his failure to name a medical expert. Without such testimony, the court held, Watson could not prove the falsity of the alleged false claims, a fatal blow to his case. *King-Vassel*, 2012 WL 5272486, at *7. To review, the FCA makes it unlawful to "knowingly present[ ], or cause[ ] to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). Watson's theory of the case was that various prescriptions made to N.B. were not eligible for lawful reimbursement by Medicaid. And, because King-Vassel caused claims to be made to the federal government for those prescriptions, she was responsible for the presentment of a false claim. It was therefore critical to Watson's case to know whether or

not Medicaid could legally pay for the drugs as prescribed by King-Vassel. The district court held that an expert was required to testify on that issue.

Medicaid can only provide reimbursement for "covered outpatient drugs." 42 U.S.C. §§ 1396b(i)(10), 1396r-8(a)(3). Covered drugs do not include any drugs "used for a medical indication which is not a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3). Watson's theory was that King-Vassel prescribed medication to N.B. for reasons that were not medically accepted indications. Helpfully, "medically accepted indication" is a statutorily-defined term that refers to a prescription purpose approved by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, or "supported by" any of several identified "compendia," 42 U.S.C. § 1396r-8(k)(6), § 1396r-8(g)(1)(B)(i) (listing as approved "compendia" the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information (or its successor publications), and the DRUGDEX Information System). The prescriptions at issue are "off-label" and so the parties agree that the drugs were not prescribed for an indication covered under the FDCA. The district court's ruling, therefore, centers around the "compendia." These compendia are large reference books that contain a variety of information about the prescription pharmaceuticals currently available on the American market—everything from their chemical makeup to potential side-effects to the age ranges of patients the drugs have been tested on. *See Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1332-33 (S.D. Fla. 2006). The amount and type of information varies by book. *Id.* They seem to be intended primarily for an audience of health care professionals, but again, were specifically

incorporated by Congress into the statutory standard for a "medically accepted indication." 42 U.S.C. § 1396r-8(k)(6), § 1396r-8(g)(1)(B)(i).

The district court concluded, rather summarily, that "medical documents typically are not readily understandable by the general public and would require an expert to explain their application to a particular set of circumstances." *King-Vassel*, 2012 WL 5272486, at *7. Watson did not name an expert who could explain the compendia and their relevance to King-Vassel's prescriptions to N.B. Thus, according to the court, Watson did not present "definite, competent evidence" to overcome the motion for summary judgment. *Id.* We take no issue with the district court's general reasoning. Certainly, scientific evidence can be beyond the competence of a lay jury to understand, and a party may need to provide an expert to put that evidence in the proper context. But, we are not convinced that it was appropriate to apply that general rule to the specific facts of this case at this particular stage.

First, we note that King-Vassel did not move for summary judgment on the basis of Watson failing to present an expert who could explain the compendia. Rather, King-Vassel's short, two-paragraph argument relating to expert witnesses focused on the need for "experts to discuss, among other things, how claims for reimbursement for medications are presented to Medicaid programs, and how payments are made by those Medicaid programs." (R. 29 at 15.) In other words, King-Vassel's motion relies entirely on the issues we disposed of above in Section II.A. "As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to

present evidence on that point, and the district court should not rely on that ground in its decision." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013) (citation omitted).

An exception to that general rule exists, however, when "the losing party is on notice that she has to come forward with all of her evidence." *Id.* (citation omitted). The record is, at best, ambiguous as to whether this exception should apply here. The district court's February 29, 2012, scheduling order required Watson to "name all expert witnesses and produce reports from expert witnesses" by April 11, 2012. (R. 24 at 1.) So Watson was certainly on notice that he had to name any required experts prior to King-Vassel's July 16 motion for summary judgment. But there is nothing in the record giving Watson notice that the court would enter summary judgment *because* an expert was required to explain the compendia—a notion that neither the parties nor the district court seem to have considered prior to the short discussion in Watson's opposition brief. (R. 42 at 7-8.) We think this theory is a thin reed on which to hang the entry of summary judgment.

We think that conclusion is especially appropriate because, viewing the record in the light most favorable to Watson, we are not convinced that an expert was necessarily required to explain the compendia with respect to each of Watson's claims. Recall that an expert witness may be required when the ability to interpret the evidence presented is not within the capability of a lay juror. Watson wanted to present evidence that King-Vassel's prescriptions to N.B. were not for a medically accepted indication that was supported by any of the statutorily-listed drug compendia. Again, the compendia provide a great deal of information about individual pharmaceuticals.

*Edmonds*, 417 F. Supp. 2d at 1332-33. So any given prescription could turn out to be unsupported for any number of reasons—from the relatively simple to the dizzyingly complex. Watson argued in the district court, and to us, that the prescriptions here (or at least some of them) were unsupported for simple reasons such as N.B.'s age. Because there were no indications that were supported for certain drugs for *any* patient of N.B.'s age, Watson argues, the prescriptions to N.B. must not have been for a medically accepted indication.[2] (Appellant's Br. at 15-17.) This analysis, says Watson, would not require the assistance of an expert. We agree.

The district court presumed that interpreting the compendia would be a far more complicated task, indeed one that would require a medical expert. At the summary judgment stage, when the court must view the record in the light most favorable to the nonmoving party, *Fitzgerald*, 707 F.3d at 730, we think this presumption was error. To be sure, the district court was correct to lament the fact that "Watson did not submit any pages of [the compendia] to the Court that would show how easy it would be [to interpret them]." *King-Vassel*, 2012 WL 5272486, at *7. But, Watson was not put on notice by anything in the record that such submissions would be useful to the court at this stage, much less that they would be dispositive.

---

[2] Watson asks us to take judicial notice of a chart on one of the cited pages. His appellate counsel created this chart, purportedly based on the drug compendia, but Watson did not enter it into the district court record. His appellate counsel has attempted to enter this chart into the record in a separate case in another court. (Appellant's Br. at 15 n.28.) Regardless, we decline Watson's invitation.

The district court may very well be correct that Watson requires an expert to explain some number of the prescriptions he charges constitute false claims. For instance, if N.B. was prescribed a specific drug to treat "anxiety," and there is support in one of the compendia for prescribing the drug to treat "depression," Watson would need to present expert testimony to prove that those two diagnoses are not co-extensive. But the sweeping nature of the summary judgment order cut off all of Watson's claims without regard to the specific facts underlying each one. And it did so despite the fact that King-Vassel had not moved for summary judgment on that basis. While the district court remains free to apply its reasoning in a more specific manner on remand (because, of course, Watson did not name any experts by the court's deadline), we think the summary judgment order as written was premature and overbroad.

Before concluding, we feel compelled to note that nothing in this opinion should be read to countenance the pre-suit actions of either Watson or his trial counsel: they dragged blameless parties into court unnecessarily and sought a medical release by representing that Watson was going to treat N.B.—"a total falsity." *King-Vassel*, 2012 WL 5272486, at *9. Invoking its "inherent power" under *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991), the district court levied monetary sanctions against the pair for "skirting the line of their respective professional responsibilities." *King-Vassel*, 2012 WL 5272486, at *9. Regarding Watson, the court noted that he had "obtained N.B.'s medical records in a manner that could best be described as borderline-fraudulent." *Id.* Those sanctions have not been appealed, and, in any event, we would be

hard-pressed to improve on the district court's description. If anything, we might remove the word "borderline." Despite ruling in Watson's favor today, we hope that the district court's sanctions will dissuade professionals from stooping to such unsavory tactics in the future.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment, and REMAND for further proceedings consistent with this opinion.