In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1151

JORDAN WATKINS,

*Plaintiff-Appellant,*

*v.*

BRIJ MOHAN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-02045 — **Franklin U. Valderrama**, *Judge.*

ARGUED NOVEMBER 8, 2024 — DECIDED JULY 16, 2025

Before RIPPLE, HAMILTON, and KIRSCH, *Circuit Judges.*

HAMILTON, *Circuit Judge.* While he was in federal custody, plaintiff-appellant Jordan Watkins underwent a hernia repair operation at an outside hospital. He began experiencing severe pain and swelling in his groin. Medical staff at the correctional facility allegedly told Watkins that his pain and swelling were ordinary side effects of his surgery. The medication they gave him did not relieve his pain or swelling, and they refused to schedule a follow-up appointment with his

surgical team before he was transferred to another federal facility.

Watkins brought *Bivens* claims alleging that medical and correctional staff had been deliberately indifferent to his serious medical needs. See generally *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He also brought a claim under the Federal Tort Claims Act (FTCA) against the United States for negligent medical treatment. See 28 U.S.C. § 1346(b). The district court dismissed all of his claims on the pleadings under Federal Rule of Civil Procedure 12(b)(6). The court thought the Supreme Court's current framework for evaluating *Bivens* claims should bar Watkins' *Bivens* claims and that he sued too late on his FTCA claim. We reverse on both grounds.

In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court recognized an implied damages remedy under *Bivens* against federal prison staff for providing constitutionally inadequate medical care. Over the last eight years, starting with *Ziglar v. Abbasi*, 582 U.S. 120 (2017), the Court has sharply curtailed the extension of *Bivens* to new contexts. Nevertheless, *Carlson* remains good law. It allows federal prisoners to sue for damages resulting from deliberate indifference to their serious medical needs. Under a straightforward application of *Carlson* and the Supreme Court's current legal framework for evaluating *Bivens* claims, Watkins' constitutional claims may go forward. Also, although Watkins' suit under the FTCA is untimely, he may be able to establish the requirements for equitable tolling.

I.  *Factual and Procedural Background*

The following facts are drawn from the allegations of the complaint, which we must accept as true when reviewing the grant of a motion to dismiss on the pleadings. *Sargeant v. Barfield*, 87 F.4th 358, 361 (7th Cir. 2023).

A.  *Watkins' Surgery and its Aftermath*

Watkins was in federal custody in Chicago at the Metropolitan Correctional Center (MCC) as a pretrial detainee from October 22, 2018 to July 18, 2019 and as a convicted prisoner from July 18, 2019, when he was sentenced, to July 29, 2019, when he was transferred to another prison. On June 12, 2019, he underwent hernia repair surgery at an outside hospital. His discharge instructions said he should schedule a follow-up appointment with the hospital within two weeks of his surgery. After returning to MCC, Watkins "immediately" began experiencing severe pain and swelling in his groin, with his testicles swelling "to the size of a grapefruit." His pain and swelling became so severe that he could not sit or sleep.

Around three days after his surgery, Watkins told MCC medical staff, including defendant and Clinical Director Dr. Brij Mohan, of his pain and swelling. The medical staff dismissed his swelling as a "routine and benign side effect of the hernia repair surgery." They gave Watkins medication, but it was ineffective for relieving his pain or reducing the severe swelling in his scrotum. MCC staff denied his request to schedule a follow-up appointment with his surgical team. They did not provide any additional care to address Watkins' pain or swelling.

Watkins continued to report post-operative pain during the remainder of his custody at MCC. Despite his

"progressively worsening medical condition," MCC medical staff cleared him for transfer from MCC. He was transferred to a new correctional facility on July 29, 2019. Watkins did not undergo surgery to address the ongoing complications from his hernia repair surgery until February 12, 2020.

B.  *Procedural Background*

During the fall of 2019, Watkins began pursuing administrative remedies for the inadequate medical care he believes he received at MCC. He first submitted a request for an Informal Resolution Administrative Remedy in October 2019. Then, in November 2019, Watkins submitted a Request for Administrative Remedy to the United States Department of Justice. The Bureau of Prisons (BOP) issued a final denial of Watkins' request for administrative remedy on July 20, 2020.

Watkins filed suit in the Northern District of Illinois on August 7, 2020, just eighteen days after the Bureau issued its Final Denial. Complaint, *Watkins v. Mohan*, No. 20-cv-4662 (N.D. Ill. Aug. 7, 2020), ECF No. 1 (*Watkins I*). That suit was dismissed for reasons explained below. Watkins filed this second suit on March 24, 2021, asserting essentially the same claims as in *Watkins I*. The district court granted his request for attorney representation and recruited trial counsel to represent him. Through his recruited counsel, Watkins submitted a new operative complaint.

In his complaint, Watkins brought four claims under *Bivens* against Dr. Mohan and unnamed MCC medical and correctional staff. He alleged that Dr. Mohan and other MCC staff violated his constitutional rights by providing inadequate medical care. Watkins also asserted one claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), against the

United States for negligent medical treatment. The Department of Justice represents all the defendants and moved to dismiss Watkins' claims under Federal Rule of Civil Procedure 12(b)(6). It argued that Watkins had failed to state a claim for relief under *Bivens* and that Watkins' FTCA claim was time-barred. Watkins opposed the motion to dismiss on the grounds that his *Bivens* claims fit within the cause of action recognized by *Carlson v. Green* and that equitable tolling excused the untimely filing of his FTCA claim.

The district court granted defendants' motion to dismiss. It held that Watkins' constitutional claims fail because they arose in a "new context" to which *Bivens* should not be extended. It also held that equitable tolling is not available for Watkins' FTCA claim because he did not exercise reasonable diligence in filing this second lawsuit. *Watkins v. Mohan*, 2023 WL 8527414 (N.D. Ill. Dec. 8, 2023). Watkins has appealed.[1]

We reverse. In Part II, we explain that Watkins' Eighth Amendment claims fall well within the right of action recognized by the Supreme Court in *Carlson v. Green*. In Part III, we explain that the dismissal of Watkins' FTCA claim was premature because he has shown that he may be able to benefit from equitable tolling.

---

[1] Watkins' operative complaint identifies as the constitutional grounds for his claims the Eighth and Fourteenth Amendments. Complaints need not identify legal theories, of course, but on remand, Watkins might wish to seek leave to amend his complaint to clarify that treatment of a federal pretrial detainee is governed by the Fifth Amendment rather than the Fourteenth.

II.  *Watkins' Bivens Claims*

We review de novo a district court's dismissal of a complaint for failure to state a claim. *Fosnight v. Jones*, 41 F.4th 916, 921 (7th Cir. 2022). We take all the facts alleged in Watkins' complaint as true and give him the benefit of all reasonable inferences. *Id.*

A.  *Same Context as Carlson*

Since this nation's founding, federal courts have awarded damages against federal officers for violating the legal rights of United States citizens and others. See James E. Pfander, *Constitutional Torts and the War on Terror* 3–18 (Oxford: Oxford University Press 2017); *id.* at 9 (in the nineteenth century, courts "came to understand that their duty was to apply the law and determine, often with the help of a jury, the legality of official action. The burden of ameliorating the financial consequences of personal liability fell to Congress …."); see also *Bivens*, 403 U.S. at 395–96 (noting precedents for damages actions). The Supreme Court continued that historical practice in *Bivens* when it recognized a right of action for damages directly under the Constitution for violations of individual rights by federal officials.

In *Bivens*, the plaintiff sought damages against federal officers who entered and searched his home without a warrant and arrested him using unreasonable force. 403 U.S. at 389. But the Court did not limit *Bivens* to Fourth Amendment claims. First, in *Davis v. Passman*, the Court recognized an implied damages action against a member of Congress for workplace sex discrimination in violation of the equal protection prong of the Fifth Amendment. 442 U.S. 228, 248–49 (1979). Then, in *Carlson*, the Court extended *Bivens* to a claim against

federal prison officials for failing to provide adequate medical care in violation of the Eighth Amendment. 446 U.S. at 18–19.

Since then, the Supreme Court has limited *Bivens* in a variety of ways, most importantly now in refusing to authorize *Bivens* actions in "new contexts." See *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (collecting cases refusing to recognize an implied damages remedy). But the Court has repeatedly declined to overrule *Bivens*, *Davis*, or *Carlson*. See *Egbert v. Boule*, 596 U.S. 482, 491, 502 (2022) (rejecting *Bivens* in new context but refraining from reconsidering *Bivens*); *Snowden v. Henning*, 72 F.4th 237, 242 (7th Cir. 2023) ("the Court has stopped short of overruling the *Bivens* trilogy").

Instead, the Court has fashioned a two-step framework to determine whether a *Bivens* action may proceed. Under the first step of the Court's current approach, a plaintiff's damages action against a federal official may proceed if it arises in an existing *Bivens* context. *Egbert*, 596 U.S. at 492. But if the plaintiff's case presents a "new *Bivens* context," the court must consider whether special factors indicate that "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.*, quoting *Ziglar*, 582 U.S. at 139, 136. Most recently, the Court held that a claim of excessive force under the Eighth Amendment presented a new context, implicitly beyond the scope of the *Carlson* context of deliberate indifference in prison health care. *Goldey v. Fields*, 606 U.S. —, 2025 WL 1787625 (2025).

We resolve this case at step one of the *Bivens* inquiry. We recently reiterated in *Brooks v. Richardson* that *Carlson* makes relief available for claims that "a federal prison's staff provided constitutionally deficient medical care." 131 F.4th 613,

615 (7th Cir. 2025). Watkins asserts that federal prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by giving him constitutionally inadequate care after his surgery. Because Watkins' claims arise from allegedly constitutionally inadequate medical care in a federal prison and his principal theory is identical to that of the plaintiffs in *Carlson* and *Brooks*, his claims fit squarely within the *Bivens* claim recognized by *Carlson*. See *Brooks*, 131 F.4th at 614, 616 (reversing dismissal of similar *Bivens-Carlson* claim where plaintiff sought damages for prison staff's failure to diagnose or treat his appendicitis); see also *Stanard v. Dy*, 88 F.4th 811, 817 (9th Cir. 2023) (recognizing a *Bivens-Carlson* claim because plaintiff sought "a damages remedy for failure to provide medical attention evidencing deliberate indifference to serious medical needs"); *Watanabe v. Derr*, 115 F.4th 1034, 1041 (9th Cir. 2024) (same).

Defendant Mohan points to a few allegations in Watkins' complaint about his supervisory responsibilities as evidence that Watkins' claims rely on a theory of respondeat superior, which cannot form the basis of *Bivens* liability. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (in a *Bivens* action, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*"). The Supreme Court's general rejection of respondeat superior liability for *Bivens* claims is clear, but the government's argument here relies on too narrow a reading of Watkins' complaint, one that is inconsistent with the standard for review on a motion to dismiss. To survive a motion to dismiss for failure to state a claim, a plaintiff need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at

678, citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2006).

Watkins alleges that he informed Dr. Mohan himself of his post-operative pain and swelling and that Dr. Mohan failed to take any action to address his serious medical needs. Watkins is therefore challenging the personal acts and omissions of Dr. Mohan, not merely seeking to hold him responsible for the conduct of the staff he supervises. The allegations in Watkins' complaint about Dr. Mohan's supervision of other MCC medical and nursing staff do not defeat all his *Bivens* claims. See also *Brooks*, 131 F.4th at 615 (local supervisors are exposed to *Bivens* claims but "may prevail on the merits because *Bivens* does not create vicarious liability" (citing *Iqbal*, 556 U.S. at 677)).

B. *No Meaningful Differences*

Defendants argue that Watkins' case is meaningfully different from *Carlson* such that his constitutional claims should be deemed to have arisen in a new "context" so that they should be dismissed. The Supreme Court has explained that a context is new if the plaintiff's claim "is different in a meaningful way" from an earlier *Bivens* claim authorized by the Court. *Ziglar*, 582 U.S. at 139. A meaningful difference is one that "might alter the policy balance that initially justified the implied damages remedies in the *Bivens* trilogy." *Snowden*, 72 F.4th at 239. It is not the case, however, that any degree of variation will preclude a *Bivens* remedy. "Some differences, of

course, will be so trivial that they will not suffice to create a new *Bivens* context." *Ziglar*, 582 U.S. at 149.[2]

Defendants have identified two distinctions that they argue are meaningful in terms of "the generality or specificity of the official action," "the risk of disruptive intrusion by the Judiciary," and "the extent of judicial guidance." See *Ziglar*, 582 U.S. at 140. First, defendants say, Watkins' case involves inadequate postoperative care, not an acute medical emergency, as in *Carlson*. Second, Watkins was a pretrial detainee for part of his time and medical care at MCC, so MCC staff had to address his medical needs amidst uncertainty about whether and when he might be transferred to a different facility. According to defendants, these features of Watkins' claims "implicate and challenge broader-level and more systemic issues within the BOP." They specifically identify the "housing and transfer of pre-trial detainees and inmates between facilities; the resource allocation, security, and timing decisions relating to outside consultation; and the scheduling of care" as issues over which *Carlson* did not authorize judicial oversight.[3]

---

[2] Our *Bivens* analysis applies to Dr. Mohan and the unnamed members of MCC's medical and correctional staff designated in Watkins' complaint, so we refer to "defendants" collectively throughout this section.

[3] Defendants also argue that Watkins' case is meaningfully different from *Carlson* because his treatment as a pretrial detainee was subject to the Fifth Amendment rather than the Eighth Amendment. The dissenting opinion makes the same argument. In the district court, however, that distinction was not drawn at all, let alone addressed, by the parties or the district court. *Watkins*, 2023 WL 8527414, at *7 n.10. No one in the district court appears to have focused on the distinction between the Fourteenth Amendment's Due Process Clause, which applies to state pretrial detainees, and the Fifth Amendment's Due Process Clause, which applies to

Under the Supreme Court's current framework for as-
sessing *Bivens* claims and our case law applying that frame-
work, neither Watkins' transitionary status nor his complaints
of post-operative pain constitute meaningful differences that
would defeat his claims. First, there is no difference between
"the generality or specificity of the official action" challenged
in this case and in *Carlson*. See *Ziglar*, 582 U.S. at 140. As a
threshold matter, all federal detainees and prisoners are sub-
ject to transfer to different facilities at any time for a host of
reasons, which might or might not implicate medical treat-
ment. Watkins' complaint does not identify any broadly ap-
plicable BOP policy, and the record is plainly insufficient to
assess whether his claims implicate any such policies. But
even if factual development reveals later that he was treated
pursuant to a broadly applicable policy, Watkins, like the
plaintiff in *Carlson*, is challenging the discrete acts and omis-
sions of particular medical and correctional personnel who
treated him or made decisions about his care. If Watkins was
treated pursuant to a BOP policy, he can still challenge the
application of that policy to the facts of his case. See *Stanard*,
88 F.4th at 817–18 (fact that plaintiff challenged defendant's

---

federal pretrial detainees. We note that the plaintiff in *Carlson* alleged vi-
olations of the Fifth Amendment's Due Process Clause and its equal pro-
tection component, as well as the Eighth Amendment. See *Green v. Carlson*,
581 F.2d 669, 671 (7th Cir. 1978), *aff'd*, 446 U.S. 14 (1980). Although Wat-
kins' legal status changed from pretrial detainee to convicted prisoner, the
MCC medical staff defendants always had a constitutional duty to re-
spond reasonably to his known serious medical needs. Moreover, courts
assess the viability of multiple *Bivens* claims as they do all others—on a
claim-by-claim basis. E.g., *Egbert v. Boule*, 596 U.S. 482 (2022) (assessing
separately the viability of First and Fourth Amendment claims). We leave
further sorting out of these nuances to the district court on remand.

application of "broadly applicable BOP policy governing HCV treatment protocol in federal prisons" did not take his claim out of *Carlson* context).[4]

To the extent that Watkins' claims implicate administrative considerations regarding scheduling, outside consultation, or prison assignment, that would not remove them from *Carlson*'s ambit. Defendants misapprehend the scope of the cause of action recognized in *Carlson* and assert an argument that *Brooks* rejected.

Careful attention to the facts of *Carlson* shows that the Court anticipated that its decision would lead to judicial scrutiny of administrative decisions by federal prisons in the context of health care. While *Carlson* might be best remembered for involving prison medical officials' mishandling of a prisoner's asthma attack and that prisoner's subsequent death, the plaintiff's allegations were not so limited. The plaintiff also alleged that the defendants mismanaged the prisoner's asthma throughout his incarceration. See *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978) (plaintiff alleged that prison medical officials had failed to give the deceased prisoner proper medication or the steroid treatments ordered by his outside physician), *aff'd*, 446 U.S. 14 (1980). *Carlson* thus also dealt with management of a chronic, non-emergent medical condition requiring continuous, periodic treatment over many months, as well as all the administrative decisions that such treatment

---

[4] Because Watkins is challenging only the specific actions of medical and correctional officers who were involved in his care, his case does not present a challenge "to the formulation of medical-care guidelines, policies, or protocols in prison." *Brooks*, 131 F.4th at 616. It therefore does not run afoul of the *Brooks* holding that such challenges present a new context to which *Bivens* and *Carlson* should not be extended. See *id.* at 616–17.

necessarily entails. The decision was not limited—explicitly or implicitly—in the ways defendants argue.

Moreover, *Carlson* also involved allegations about prison assignment and transfer. 446 U.S. at 16 n.1 (plaintiff alleged that the defendants "being fully apprised of the gross inadequacy of medical facilities and staff at [FCC Terre Haute] and of the seriousness of Jones' chronic asthmatic condition, nonetheless kept him in that facility against the advice of doctors"). These allegations reflect, and *Carlson* recognized, the reality that in prison, medical care is not hermetically sealed off from non-medical decision-making. In light of *Carlson*'s facts, Watkins' allegations that defendants failed to give him proper medication, failed to follow his surgical team's instructions, and failed to delay his transfer to another facility are no more disruptive or intrusive than what *Carlson* itself already approved.[5]

Even if *Carlson* had not spoken directly to the differences defendants rely upon to distinguish it, their argument would still be flawed. The main thrust of defendants' argument is that "claims that bear on general administrative and scheduling concerns are not cognizable under *Bivens*." This is a variation on a theme that *Brooks* already rejected. As our opinion explained, *all* requests for medical care implicate resource constraints and therefore entail decisions about scheduling

---

[5] In *Sargeant v. Barfield*, we affirmed dismissal of a claim for failure to protect the plaintiff from violence from another prisoner. 87 F.4th 358 (7th Cir. 2023). We reasoned that the claim challenged prison officials' housing assignments, thus presenting a "new context" beyond *Carlson* because it implicated non-medical decisions. *Id*. at 367. Because *Carlson* itself involved allegations about prison assignment and transfer in the context of medical care, *Sargeant*'s reasoning does not block Watkins' claims.

and priorities. 131 F.4th at 615–16. So, the fact that Watkins' requests for medical care required defendants to allocate scarce resources among competing demands does not distinguish this case from *Carlson* or *Brooks*, or indeed from the mine-run of medical deliberate-indifference cases.[6]

The dissenting opinion suggests that allowing Watkins' claims to proceed will launch a new era of judicial interference with BOP operations. Post at 42–43. Not at all. Federal courts have been hearing a wide variety of federal prison health-care cases for more than fifty years since *Bivens* was decided and more than forty years since *Carlson* was decided. We also hear even greater numbers of cases involving health care for prisoners in state prisons and detainees in county jails. Medical and correctional staff can consult decades of circuit precedent applying the deliberate-indifference standard in cases involving the management of long-term ailments, consultation with outside providers, and prison assignment or transfer. E.g., *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679–81 (7th Cir. 2023) (no deliberate indifference where prison medical staff delayed follow-up care until ten days after initial hospital visit and failed to prescribe more potent painkillers); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) (no deliberate indifference where there was no evidence that defendant's "actions or inaction caused any

---

[6] The dissenting opinion takes the government's arguments even further, proposing that the context of *Carlson* be narrowed based on different types of BOP facilities, different diagnoses, different degrees of medical urgency, different severity of injuries, different transfer schedules for prisoners, and different roles played by BOP medical staff v. outside medical providers. Those arguments come close to urging that *Carlson* be limited to its facts. Neither the Supreme Court nor this court has tried to slice so finely the "new context" inquiry in *Bivens* jurisprudence.

of the scheduling delays" with post-surgery follow-up appointment); *Zaya v. Sood*, 836 F.3d 800, 805–07 (7th Cir. 2016) (jury could find deliberate indifference where prison doctor waited nearly seven weeks to authorize follow-up appointment to off-site orthopedic specialist treating plaintiff's broken wrist); *Cotts v. Osafo*, 692 F.3d 564, 565–66 (7th Cir. 2012) (prison officials at two different prisons delayed surgical hernia repair by outside surgeon for a combined period of 13 months); *Roe v. Elyea*, 631 F.3d 843, 862–63 (7th Cir. 2011) (affirming jury verdict finding deliberate indifference where "inmates were denied further testing and treatment for HCV infection *categorically* based on the expected length of their continued incarceration in an IDOC facility"); *Berry v. Peterman*, 604 F.3d 435, 441–42 (7th Cir. 2010) (delay of two months in referring prisoner to off-site dentist; jury could find that doctor decided prisoner could endure his pain until upcoming transfer to another prison); *Lee v. Young*, 533 F.3d 505, 510–12 (7th Cir. 2008) (no deliberate indifference where asthmatic prisoner complained, among other things, that he should have been transferred to a different facility to avoid exposure to secondhand smoke); *Hudson v. McHugh*, 148 F.3d 859, 863–64 (7th Cir. 1998) (holding that prisoner stated a claim against jail officers and nurse for failing to give him his daily epileptic medicine after transfer).

In each of these cases—and many more examples could be cited—prison officials had to navigate resource, medical, and/or security constraints. When defendants act reasonably within those constraints, they have a defense to liability. E.g., *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference."), citing *Farmer*

*v. Brennan*, 511 U.S. 825, 844 (1994). But we will not "smuggle a potential defense into the pleading stage and use it as a reason why the claim does not exist." *Brooks*, 131 F.4th at 616.

That is what defendants ask us to do here. Defendants may have acted reasonably within the constraints imposed by Watkins' transitionary status. See *id.* at 615–16 (medical triage may reasonably affect a prisoner's level of care); *Elyea*, 631 F.3d at 863 ("administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions"). If, as defendants suggest, Watkins needed a "long-term care plan with follow-up appointments and stable monitoring," that may not have been achievable during his time at MCC. The Constitution does not require that prisoners receive "unqualified access to health care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006), quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). But these are arguments about what constituted adequate, minimum-level medical care under the circumstances, not differences that alter the policy balance that initially justified *Carlson* or that would justify dismissal on the pleadings here.

To sum up, *Carlson* has been settled law for more than forty years. Our job is to apply that settled law consistent with the Supreme Court's current framework for evaluating the viability of *Bivens* claims. We recognize that the Court has cut back substantially on the *Bivens* remedy and its deterrent against abuse of power and authority by federal agents, perhaps the only legal deterrent not controlled by the executive branch itself. But again, the Court's latest cases are not a green light for "defendants' effort to smuggle potential substantive defenses into the question whether the suit presents a new

context." *Brooks*, 131 F.4th at 616. Because Watkins' claims that MCC medical and correctional staff violated their constitutional duty to provide him with adequate medical care fall well within the right of action recognized by *Carlson*, his *Bivens* claims may go forward.

III. *Timeliness of Watkins' FTCA Claim*

A plaintiff pursuing an FTCA claim in court must meet two separate timing requirements under 28 U.S.C. § 2401(b). First, the plaintiff must present an administrative claim to the appropriate federal agency within two years of the claim accruing. Both sides agree that Watkins satisfied this requirement by presenting his administrative claim to the Bureau of Prisons within five months of his hernia repair surgery. Second, the plaintiff must file suit within six months of the "notice of final denial of the claim by the agency to which it was presented." *Id.* Both parties also agree that Watkins missed this second filing deadline because this second suit was filed approximately eight months after the Bureau of Prisons mailed its final denial of his claim.

Watkins' late filing is not necessarily fatal to his FTCA claim. Both of "the FTCA's time bars are nonjurisdictional and subject to equitable tolling." *United States v. Wong*, 575 U.S. 402, 420 (2015). Equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). "The realm of equitable tolling is a 'highly fact-dependent area' in which courts are expected to employ 'flexible standards on a case-by-case basis.'" *Socha v. Boughton*, 763 F.3d 674, 684 (7th Cir. 2014) (*Socha II*), quoting *Socha v. Pollard*, 621 F.3d 667, 672 (7th Cir. 2010) (*Socha I*).

Nonetheless, equitable tolling is rare. *Id.* It will not save an untimely filing caused by "a garden variety claim of excusable neglect." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Watkins has good arguments, however, that his situation is quite different from garden variety excusable neglect.

A.  *Factual Background on FTCA Claim*

Because the facts bearing on the availability of equitable tolling are not relevant to Watkins' *Bivens* claims, we set them out here.[7] This is Watkins' second suit arising from his hernia repair surgery. He filed his first pro se complaint on August 7, 2020, just eighteen days after the Bureau of Prisons issued a final denial of his administrative claim. Complaint, *Watkins v. Mohan*, No. 20-cv-4662 (N.D. Ill. Aug. 7, 2020), ECF No. 1 (*Watkins I*). That complaint met both timing requirements imposed by section 2401(b), but it was ultimately dismissed for reasons out of Watkins' control.

Shortly after filing that original complaint, Watkins submitted three applications for leave to proceed in forma pauperis in August and September 2020. On November 2, 2020, the district court entered an order denying all three of Watkins' applications. The order explained that each application was incomplete and warned Watkins that his suit would be dismissed unless he submitted a fourth, complete application by December 4, 2020. Due to disruptions in prison mail

---

[7] In our recitation of facts, we include the date that Watkins claims he received notice of the dismissal of his first suit, *Watkins I*, even though that date was not presented to the district court. "A party appealing a Rule 12(b)(6) dismissal may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); accord, e.g., *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 861 (7th Cir. 1999).

service caused by COVID-19, however, Watkins did not receive the November 2 order until well after the district court's December 4 deadline. Because the district court never received a fourth application from Watkins, on December 21, 2020, it dismissed *Watkins I* without prejudice for failure to comply with the November 2 court order.

The dismissal of *Watkins I* left Watkins 30 days to refile his suit before the six-month time to file suit under the FTCA expired on January 20, 2020. Two obstacles prevented him from refiling during that 30-day window. First, after being exposed to someone who tested positive for COVID-19, Watkins was placed in quarantine on January 11. In quarantine, Watkins did not have access to his documents, mail, phones, or a computer, so he could not have filed a new lawsuit during that time. Second, Watkins did not receive notice of the dismissal of *Watkins I* until January 26, six days after the limitations period for his FTCA claim had already expired. Watkins was not released from quarantine until February 3.

At that point, Watkins would have needed to assess his options to determine whether and how he could pursue his FTCA claim despite the expiration of the statute of limitations. Assessing options and choosing an effective response would challenge many trained and experienced lawyers already familiar with federal civil practice. Would it be best to try a Rule 59 motion? A Rule 60 motion? An appeal? A new lawsuit? Something else? And should these procedures be used simultaneously or in a particular sequence?

Then Watkins' ability to pursue his FTCA claim was again interrupted by COVID-19 on March 3, when he reentered quarantine after testing positive for COVID-19. He did not leave quarantine until March 16. Eight days later, on March

24, Watkins delivered his complaint and summons for this lawsuit to prison staff for mailing. He also included a complete application for leave to proceed in forma pauperis and a motion for appointment of counsel. This suit was docketed in the district court three weeks later on April 15, 2021.

The district court granted Watkins' application to proceed in forma pauperis and recruited counsel to identify potential additional defendants and to determine whether an amended complaint would be appropriate. After Watkins' appointed counsel filed a second amended complaint, the defendants moved to dismiss Watkins' suit under Rule 12(b)(6). The government argued that Watkins' FTCA claim was time-barred. In response, Watkins conceded that this suit had been filed late but argued that equitable tolling should apply.

The district court agreed with the government and dismissed Watkins' FTCA claim under Rule 12(b)(6) as untimely. Both the government and the district court thought the limitations period might have been equitably tolled until February 3, when Watkins was released from his first period of quarantine. But the court concluded that Watkins had not diligently pursued his rights during the periods when he was not in quarantine. On appeal, Watkins argues that dismissal of his FTCA claim was premature.

B.  *Standard of Review*

Before addressing the merits of Watkins' equitable tolling argument, we need to clarify the standard of review that we apply to a district court's denial of equitable tolling. The proper standard of review in a particular case depends on how and when an issue is raised.

"We review de novo a district court's decision to dismiss a complaint on statute-of-limitations grounds." *Chicago Building Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014). Equitable tolling is one of the theories that a plaintiff may raise to defeat a statute of limitations defense. When a district court denies equitable tolling at the motion to dismiss stage, it is making a judgment that the complaint fails to state a claim for relief because it is "indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005). We therefore review de novo a district court's rejection of a plaintiff's equitable tolling argument on a Rule 12(b)(6) motion to dismiss. *Rosado v. Gonzalez*, 832 F.3d 714, 716–17 (7th Cir. 2016) (reviewing de novo a district court's rejection of plaintiff's equitable tolling argument on a motion to dismiss); *Savory v. Lyons*, 469 F.3d 667, 670, 673–74 (7th Cir. 2006) (same).[8]

The government argues that we should instead review the district court's decision for abuse of discretion. But that deferential standard applies only to a district court's equitable judgment based on a full record. See, e.g., *Clark v. Runyon*, 116 F.3d 275, 277 (7th Cir. 1997) ("Deferential review is particularly appropriate here, where the district court made the tolling decision after a full evidentiary hearing and where both of the tolling issues that Clark has raised on appeal are highly dependent on the facts as the court found them to be."). In the habeas context, we have explained that deferential review is

---

[8] "Though district courts have granted Rule 12(b)(6) motions on the basis of affirmative defenses and this court has affirmed those dismissals, we have repeatedly cautioned that the proper heading for such motions is Rule 12(c), since an affirmative defense is external to the complaint." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 n.1 (7th Cir. 2012).

not warranted when a district court rules on the issue of equitable tolling despite "an obvious need for further record development." *Famous v. Fuchs*, 38 F.4th 625, 630 n.17 (7th Cir. 2022), citing *Schmid v. McCauley*, 825 F.3d 348, 350 (7th Cir. 2016). That principle also applies in the context of general civil litigation.

At the pleading stage, there will usually be an "obvious need for further factual development" on a plaintiff's equitable tolling argument. See *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (affirmative defenses "typically turn on facts not before the court" on motion to dismiss). Equitable tolling can require a nuanced examination of the plaintiff's conduct to determine whether the plaintiff pursued his legal rights diligently and an equitable evaluation of whether the circumstances justify extraordinary relief. *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 941 (7th Cir. 2016) (applying similar analysis to equitable defense of acquiescence in trademark context). Without a complete factual record, a district court generally does not have a reliable foundation for making this kind of fact-dependent equitable judgment. See *id.*

The Federal Rules of Civil Procedure provide mechanisms for resolving a strong statute of limitations defense early. If a plaintiff or defendant attaches materials in evidentiary form to a motion to dismiss or response, a judge may consider those materials and convert a motion to dismiss into a motion for summary judgment after giving both sides "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Alternatively, a defendant may plead the statute of limitations as a defense and file a motion for summary judgment with supporting affidavits. See *Early*

*v. Bankers Life & Casualty Co.*, 959 F.2d 75, 78 (7th Cir. 1992) (describing these procedures). A district court may also hold an evidentiary hearing to supplement the record before ruling on a motion to dismiss on a statute of limitations defense. E.g., *Clark*, 116 F.3d at 276–77 (reviewing for abuse of discretion a district court's decision to deny equitable tolling after two-day bench trial). Following these procedures allows the issue to be "fully developed at trial" or to "come up to us with a full, or least a fuller, factual picture." *Early*, 959 F.2d at 78.

The district court did not convert defendants' motion to dismiss into a motion for summary judgment, nor could it have. The generalized allegations in Watkins' response brief on which the court relied were not presented in affidavit form, as would have been required by Rule 56(c)(1)(A). The court also did not consider, at least on the record, whether an evidentiary hearing was needed to supplement the record on equitable tolling. Because the court dismissed Watkins' FTCA claim for failure to state a claim, we review de novo its rejection of Watkins' equitable tolling argument.

C. *Equitable Tolling at the Pleading Stage*

We begin our analysis by clarifying the period for which Watkins is seeking equitable tolling. The district court's analysis rested on a significant factual and legal error. It thought that Watkins needed to establish that the limitations period was tolled until April 15, 2021, the date this suit was docketed. He did not.

A plaintiff whose claim is untimely needs to establish that the limitations period was tolled until he filed his complaint. In most civil litigation, a complaint is deemed filed when it is received by the court. See Fed. R. Civ. P. 3; *Gilardi v. Schroeder*,

833 F.2d 1226, 1233 (7th Cir. 1987). But Watkins was incarcerated at the time he filed this suit, so the prison-mailbox rule applies. Under the prison-mailbox rule, Fed. R. App. P. 4(c), "an inmate's notice of appeal is deemed filed not when received by the court but rather when delivered to prison officials for mailing." *Censke v. United States*, 947 F.3d 488, 490 (7th Cir. 2020), citing *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Taylor v. Brown*, 787 F.3d 851, 858–59 (7th Cir. 2015) (explaining that prison-mailbox rule also applies to all district-court filings). Assuming Watkins delivered his new complaint and summons to prison staff for mailing on March 24, 2021, his FTCA claim was timely if the limitations period was tolled until March 24.

The district court's failure to apply the prison-mailbox rule was an error of law that caused its equitable tolling analysis to rely on an error of fact. An equitable tolling decision must rest on an accurate assessment of the period for which the plaintiff is seeking tolling. When a district court's equitable tolling analysis relies on an erroneous fact or misconception of the law, we have remanded so that the district court can take a fresh look. E.g., *Socha I*, 621 F.3d at 670–73 (clarifying the facts on which the district court relied to deny equitable tolling and remanding for further consideration). Keeping that in mind, we proceed to the core of the argument on appeal.

Watkins offers *Hill v. United States*, 762 F.3d 589 (7th Cir. 2014), for guidance. In *Hill*, the counseled plaintiff filed his FTCA claim nineteen months after the statute of limitations expired. In opposition to the government's motion for summary judgment, the plaintiff argued that equitable tolling should excuse his delay. The district court rejected the

plaintiff's equitable tolling argument, reasoning that he had failed to exercise due diligence. Because we determined that the district court's decision was cursory and premature, we remanded for further fact-finding and consideration. *Id.* at 591. In Watkins' view, remand is also warranted in his case because he may be able to carry his burden on equitable tolling after developing a more robust factual record. We agree. The district court's conclusion that Watkins could not benefit from equitable tolling was at least premature.

Regardless of the stage of litigation, a district court errs when it makes an equitable tolling decision based on insufficient or incorrect facts. See *Schmid*, 825 F.3d at 350. But dismissing a complaint as untimely at the pleading stage is especially likely to be erroneous because, as explained above, the record will usually be insufficient to make a sound decision on equitable tolling.

When a plaintiff raises equitable tolling in opposition to a motion to dismiss, the district court's task is limited to determining whether the plaintiff might show that he satisfies the conditions for equitable tolling on a full record. If so, the plaintiff's claim is not "indisputably time-barred," see *Small*, 398 F.3d at 898, and dismissal for untimeliness under Rule 12(b)(6) is inappropriate. See *Early*, 959 F.2d at 80–81 (finding Rule 12(b)(6) dismissal premature where plaintiff alleged facts in his brief and at appellate oral argument that could justify equitable tolling); see also *Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003) (finding Rule 12(b)(6) dismissal premature where plaintiff alleged facts that could establish a defense to the statute of limitations under the discovery rule); *Sidney Hillman Health Ctr. v. Abbott Laboratories, Inc.*, 782 F.3d 922, 928–29 (7th Cir. 2015) (reversing premature dismissal).

A plaintiff defending against a motion to dismiss may, in his brief, hypothesize facts that if proven would establish the timeliness of his complaint. *Early*, 959 F.2d at 79. He need not amend his complaint with new facts or submit evidence in support of his factual allegations. *Id.* Like interpreting a complaint, determining whether equitable tolling might be available on a more complete factual record is what the Supreme Court has called a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If the plaintiff's factual allegations make the availability of equitable tolling ambiguous, it is best to defer decision until a full record is developed for summary judgment or trial.

D. *Watkins' Equitable Tolling Argument*

Applying those principles to Watkins' case reveals that the district court's dismissal of his FTCA claim was premature. At summary judgment or trial, a plaintiff seeking equitable tolling for his FTCA claim bears the burden of establishing "that (1) she 'diligently' pursued her claim; and (2) 'some extraordinary circumstances' prevented her from timely filing her complaint." *Blanche v. United States*, 811 F.3d 953, 962 (7th Cir. 2016), first citing *Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012), and then citing *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 256 (2016).

Equitable tolling does not require perfect or "maximum feasible diligence"—reasonable diligence is enough. *Holland v. Florida*, 560 U.S. 631, 653 (2010), quoting *Starns v. Andrews*, 524 F.3d 612, 618 (5th Cir. 2008). If a plaintiff shows both extraordinary circumstances and reasonable diligence, the court must weigh those considerations against the possibility of prejudice to the defendant. *Menominee Indian Tribe*, 577 U.S. at

259 n.5; *Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 562 (7th Cir. 1996). Watkins has shown that he may be able to establish both elements, and neither the government nor the district court has identified any prejudice caused by the delay.

### 1. *Extraordinary Circumstances*

Watkins has identified two potential extraordinary circumstances outside of his control that prevented him from filing this suit within the six-month limit. First, Watkins alleges that disruptions to prison mail service caused by COVID-19 caused him to receive notice of the dismissal of his timely suit in *Watkins I* after the six-month limitation period for filing his FTCA claim had already run. We have explained that "inadequate notice" is one of the "factors which may justify equitable tolling." *Donald*, 95 F.3d at 562 (internal quotation marks omitted), quoting *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984). Until Watkins was notified of the dismissal of *Watkins I*, he did not have any reason to believe he needed to do anything more to preserve his FTCA claim. As the district court recognized, "equitable tolling may well apply until the date Watkins did learn of the dismissal (or shortly thereafter)."

Second, Watkins alleges that policies implemented by the Bureau of Prisons to prevent the spread of COVID-19 prevented him from filing his second suit on time. Specifically, he alleges that the limitations period expired while he was isolated in quarantine without access to documents, mail, phones, or a computer. The district court recognized—and we agree—that periods of quarantine can constitute extraordinary circumstances. During those periods of isolation, the judge wrote, "it was nearly impossible for Watkins to pursue his claims with reasonable diligence."

The district court, however, rejected Watkins' argument that COVID-19 restrictions broadly impeded his ability to file this suit after he left quarantine on February 3. It is not clear from the court's opinion whether it believed that COVID-19 restrictions other than quarantine could never be extraordinary circumstances, or only that they did not qualify as extraordinary on the facts of Watkins' case. It characterized other district courts in the Seventh Circuit as holding that "'limitations caused by the COVID-19 pandemic' in prisons … do not constitute 'extraordinary circumstances.'" But notwithstanding that unqualified statement, the court and all the cases it cited emphasized the plaintiff's or petitioner's failure to explain how COVID-19 restrictions actually affected his ability to file on time.

To the extent the district court might have believed that COVID-19 restrictions could never be extraordinary circumstances, we respectfully believe that would have been too narrow a view of its discretion. COVID-19 restrictions other than quarantine may qualify as extraordinary circumstances. Like any other proposed extraordinary circumstances, COVID-19 restrictions would justify equitable tolling only if they actually caused Watkins' delay. But if Watkins explains more fully how COVID-19 restrictions impeded his ability to pursue his claim, it would certainly be within the district court's discretion to find that the COVID-19 pandemic and its attendant disruption were extraordinary circumstances justifying equitable tolling. See, e.g., *Rivera v. Harry*, No. 20-3990, 2022 WL 93612, at \*5 (E.D. Pa. Jan. 10, 2022) (finding equitable tolling warranted because the petitioner was "unable to timely file the Petition due to the prison's safeguards against the COVID-19 pandemic").

The evaluation will need to be case-specific, considering how multiple obstacles may have worked together to delay Watkins' response to the confounding news that his first and timely lawsuit had been dismissed. The district court specifically rejected the proposition that Watkins' limited access to the law library and legal papers could amount to extraordinary circumstances, citing district court cases rejecting those restrictions as grounds for equitable tolling. But we have previously found equitable tolling to be available where the incarcerated petitioner's limited access to his legal papers and the law library would have made it "nearly impossible … to craft a meaningful petition before the deadline." *Socha II*, 763 F.3d at 686–87; see also *Schmid*, 825 F.3d at 350 ("inability to access vital papers" is a potentially extraordinary circumstance). The court will also need to take into account the challenge Watkins faced when he was notified, after the six-month limitations period had already expired, that his timely lawsuit had been dismissed. It is difficult to imagine even a trained lawyer, let alone a prisoner acting pro se, responding to that challenge effectively without access to legal research materials and sufficient time to use them.

Moreover, prison restrictions caused by the COVID-19 pandemic may amount on their own to extraordinary circumstances even if they resemble prison restrictions imposed for other reasons or rejected as grounds for equitable tolling in other cases. The Supreme Court has cautioned against rigidly applying precedent when making an equitable tolling decision. *Holland*, 560 U.S. at 650 ("[Courts of equity] exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case."). Consistent with *Holland*, we have explained that

equitable tolling analysis requires the use of a "'flexible' standard that encompasses all of the circumstances that [a plaintiff] faced and the cumulative effect of those circumstances." *Socha II*, 763 F.3d at 686, citing *Holland*, 560 U.S. at 650. Given the flexibility inherent in the equitable tolling standard, cases that have rejected equitable tolling based on inadequate library access or similar conditions may be relevant but not dispositive. See *Estremera v. United States*, 724 F.3d 773, 777 (7th Cir. 2013) (noting that we have disallowed equitable tolling based on lack of library access "on the facts of those cases").

Right now, the record does not contain enough information to determine whether the COVID-19 restrictions at the prison where Watkins was incarcerated rose to the level of extraordinary circumstances. But on remand, Watkins may be able to show that COVID-19 restrictions made it nearly impossible for him to file this suit any sooner than he did.

### 2. *Reasonable Diligence*

As for reasonable diligence, the district court noted that "once 'an obstacle that prevents filing a suit is removed'" the litigant must sue within a reasonable period of time. It concluded that Watkins failed to "provide any justification for the delay in his filing" of this suit, which asserted "substantially the same claims" as *Watkins I*. Specifically, Watkins failed to show that he "did not have access to his papers, the law library, or the mail … while he was out of quarantine." 2023 WL 8527414, at *5.

We do not have enough information to conclude that Watkins was not reasonably diligent during the periods that he was not in quarantine. Some of the information we do have

suggests the opposite. We know that Watkins pursued his first suit diligently, even though that suit was dismissed for reasons out of his control. He filed the complaint in *Watkins I* just eighteen days after receiving a final administrative decision, and he filed an application for leave to proceed in forma pauperis before being ordered to do so by the court. Due to COVID-19 related delays in the mail, Watkins could not correct the deficiencies in his in forma pauperis applications so that his first, timely suit could go forward. While Watkins' diligence in filing *Watkins I* did not *necessarily* carry over into this suit, it is relevant context because it shows that Watkins was actively pursuing his judicial remedies. See *Irwin*, 498 U.S. at 96 ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period ….").

Although we can sometimes discern that a litigant was not reasonably diligent based on the pleadings, e.g., *Sidney Hillman Health Ctr.*, 782 F.3d at 930–31, that conclusion is not warranted here. After February 3, Watkins spent only 36 days out of quarantine before filing this suit. It is unlikely that Watkins could have acted immediately after leaving quarantine. As a pro se plaintiff, it would not have been immediately obvious to Watkins whether he still had a viable FTCA claim after the limitations period expired. As noted above, he would have needed to do legal research to learn that he could seek the modification of the judgment in *Watkins I* under Rule 59 or relief from the judgment under Rule 60. He would have also needed to do legal research to determine whether there were grounds for appealing the dismissal of *Watkins I* or to discover that equitable tolling was available.

In light of those procedural complexities, the district court's observation that this suit asserts the same claims as *Watkins I* is not probative of reasonable diligence. "It is hazardous to conjecture about the amount of time a filing should have taken based on the end result" because "sometimes it takes longer to review the possibilities" and "discard the least promising." *Socha II*, 763 F.3d at 688. From our vantage point it is not facially unreasonable for an unrepresented prisoner-plaintiff to take 36 days to research his legal options and decide how to proceed, especially with a problem as tricky as this one involving deadlines for appeal and possible Rule 59 and 60 motions.

We do not yet know the other ways that the COVID-19 pandemic may have affected Watkins' prison and his ability to pursue his claim, and we will not speculate at this time. Because these kinds of factual determinations are "not appropriately made at the pleadings stage," *Sidney Hillman Health Ctr.*, 782 F.3d at 928, we have remanded for fact-finding on reasonable diligence for far longer periods of delay. See *Hill*, 762 F.3d at 590–91 (remanding for fact-finding on whether plaintiff was reasonably diligent during a nineteen-month delay); *Early*, 959 F.2d at 77, 80–81 (remanding for fact-finding on whether plaintiff was reasonably diligent during a nearly year-long delay). And those cases did not involve a public health crisis, like COVID-19, that affected what qualifies as reasonable diligence. Although Watkins has not yet detailed how he was reasonably diligent during the relevant 36-day period, he could submit an affidavit explaining his efforts to refile this suit and how they were affected by COVID-19 restrictions. "It is best to await a final decision rather than leap into a subject that evidence may cast in a new light." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004)

(affirming denial of motion to dismiss where plaintiff may have been able to establish equitable tolling on more complete factual record).

### 3. *Proceedings on Remand*

Because Watkins has alleged facts that may amount to extraordinary circumstances, and the record does not compel the conclusion that he was not reasonably diligent, his FTCA claim is not indisputably time-barred. Watkins has done enough to have the opportunity to develop the record supporting his equitable tolling argument. The district court is best positioned to undertake this "equitable, often fact-intensive inquiry," in the first instance. *Holland*, 560 U.S. at 654, quoting *Gonzalez v. Crosby*, 545 U.S. 524, 540 (2005) (Stevens, J., dissenting). As it reconsiders Watkins' claim, we encourage the district court to "keep in mind the flexibility that is often appropriate for *pro se* litigants, who are likely not well versed in complex procedural rules." *Socha I*, 621 F.3d at 673.

We note two things in closing. First, neither the district court nor the government has suggested that tolling the limitations period would prejudice the government in any way. The administrative claim process gave the government notice of his underlying claim. In addition, Watkins timely filed his first suit, putting the government on notice of his intent to pursue the claim. If Watkins can establish extraordinary circumstances and reasonable diligence, the district court should consider the apparent lack of prejudice to the government when determining whether the balance of equities favors tolling the statute of limitations. See *Baldwin County*, 466 U.S. at 152 (absence of prejudice is "a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is

identified" but is not independent basis for invoking doctrine), quoted in *Menominee Indian Tribe*, 577 U.S. at 259 n.5; *Hill*, 762 F.3d at 590 (finding it relevant that neither district court nor government suggested that government had been prejudiced by plaintiff's untimely filing).

Second, the government argues that even if the statute of limitations was tolled for nine days between January 11 and January 20 (the period between Watkins entering quarantine for the first time and the lapse of the six-month limitations period), that extension would toll the statute of limitations only to February 12, nine days after Watkins left his first stint in quarantine. The government cites no authority for the proposition that a district court should count up the days during which an obstacle prevents a plaintiff from filing a suit and credit him exactly that many days on the back end.

Equitable tolling does not "bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990). The "doctrine of equitable tolling gives the plaintiff just so much extra time as he needs, despite all due diligence on his part, to file his claim." *Heck v. Humphrey*, 997 F.2d 355, 357 (7th Cir. 1993) (emphasis omitted), aff'd on other grounds, 512 U.S. 477 (1994); accord, *Chapple v. Nat'l Starch & Chemical Co. & Oil*, 178 F.3d 501, 506 (7th Cir. 1999) (plaintiff seeking equitable tolling must have "brought the suit as soon as it was practicable"); *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996) (equitable tolling "gives the plaintiff only the extra time that he needs, despite all due diligence on his part, to file his claim" (citing *Heck*, 997 F.2d at 357)). On remand, if the district court finds that Watkins has established extraordinary circumstances warranting

equitable tolling, the limitations period should be tolled for as long as Watkins was reasonably diligent. No more but also no less.

The judgment of the district court is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, concurring in the judgment in part and dissenting in part. Jordan Watkins sued medical staff at a pretrial detention center under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging inadequate medical treatment for chronic pain and swelling after a hernia operation. Because this claim presents a new context that risks further intrusion on legislative and executive prerogatives, I cannot agree with the decision to reinstate it and respectfully dissent. However, I agree that we should remand Watkins's claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), so the district court can revisit his entitlement to equitable tolling on a more developed record. I write separately on this issue because I feel the majority goes too far by instructing the district court on how it must evaluate the merits of this argument.

I

*Bivens* remains good law for now. Plaintiffs can still maintain causes of action for certain constitutional violations under *Bivens*, *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980). But as the Supreme Court has made clear, if a case presents a new context that is "meaningfully different" from one of these three cases, we cannot authorize a remedy if any "special factors" counsel hesitation. *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (cleaned up); *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017). This inquiry often collapses into a "single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492.

The majority extends *Carlson* to a new context despite the Court's explicit instruction not to. Resisting this conclusion, the majority overreads our holding in *Brooks v. Richardson*, 131

F.4th 613 (7th Cir. 2025), to declare that any claim that "a federal prison's staff provided constitutionally deficient medical care" fits "squarely" within the context of *Carlson*. *Ante*, at 7–8 (quoting *Brooks*, 131 F.4th at 615). This outcome is untenable under the Court's decisions curtailing the reach of the *Bivens* doctrine and its broad understanding of what constitutes a new context. *Ziglar*, 582 U.S. at 130; *Hernández v. Mesa*, 589 U.S. 93, 102 (2020).

As a threshold matter, the majority misapprehends the potential scope of Watkins's claim. Watkins was a pretrial detainee for most of his time at the Metropolitan Correctional Center (MCC), which serves as a temporary holding facility for pretrial detainees and inmates serving brief sentences. After pleading guilty, Watkins remained at the MCC as a convicted prisoner for 11 days until his transfer to a permanent prison facility. While Watkins's post-conviction care is subject to the Eighth Amendment, any claims arising from alleged mistreatment before his guilty plea are governed by the Fifth Amendment. This means that any claims predicated on pre-conviction conduct inevitably arise under a different constitutional provision from *Carlson*, which authorized a remedy for Eighth Amendment violations. 446 U.S. at 17–18. And as the Court instructed in *Ziglar*, we must consider "the constitutional right at issue" when analyzing *Bivens* contexts. 582 U.S. at 139–40. The majority largely ignores this issue, reasoning that "defendants always had a constitutional duty to respond reasonably to [Watkins's] known serious medical needs." *Ante*, at 10 n.3. While true, this fails to appreciate that claims under the Fifth Amendment undoubtedly present a new context from *Carlson*. *Stanard v. Dy*, 88 F.4th 811, 818 (9th Cir. 2023) (although post-sentencing Eighth Amendment claims could proceed, "[t]here is little doubt that [plaintiff's]

Fifth Amendment claim does present a new context" from *Carlson*). This blow is not necessarily fatal to the entire suit, because we analyze *Bivens* actions claim-by-claim. See *Egbert*, 596 U.S. at 493–502. But because claims arising out of conduct that occurred while Watkins was a pretrial detainee necessarily present a new context from *Carlson*, our analysis must focus more narrowly on the few days when he was held as a prisoner at the MCC.

We must therefore ask whether the alleged misconduct during these 11 days presents a new context from *Carlson*. As in *Carlson*, Watkins alleges that federal correctional staff provided constitutionally deficient medical care. But this does not end the analysis; even when a case presents "significant parallels" to an existing *Bivens* case, "a modest extension is still an extension." *Ziglar*, 582 U.S. at 147. The Court has provided a non-exhaustive list of factors to consider when deciding whether a claim involves a new context. *Id.* at 139–40. We have simplified the inquiry: a case is meaningfully different, and therefore a new context, "when it involves a factual distinction or new legal issue that might alter the policy balance that initially justified the implied damages remedies in the *Bivens* trilogy." *Snowden v. Henning*, 72 F.4th 237, 239 (7th Cir. 2023). We may not recognize a cause of action "if there is even a single reason to pause" before doing so. *Egbert*, 596 U.S. at 492 (cleaned up). There are at least two reasons in this case.

First, Watkins's injury differs meaningfully, in both nature and severity, from the medical conditions at issue in *Carlson* and *Brooks*. In both cases, prisoners experienced an acute medical emergency that should have received immediate treatment to avoid serious injury or death. *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978) (prisoner died because

defendants failed to give him competent medical treatment for eight hours during an extreme asthma attack); *Brooks*, 131 F.4th at 614 (prisoner with acute appendicitis was severely injured when his appendix burst because defendants refused to send him to a hospital for ten days). By contrast, Watkins had a chronic, non-emergent medical condition that required continuous, periodic treatment over several months. Courts regularly find that these types of differences create new contexts. See *Johnson v. Terry*, 119 F.4th 840, 859 (11th Cir. 2024) (new context when the "severity, type, and treatment" of the injuries "differ[ed] significantly from those of the prisoner in *Carlson*"); *Rowland v. Matevousian*, 121 F.4th 1237, 1243 (10th Cir. 2024) (new context when plaintiff did not die and defendants conservatively treated his hernia before operating); *Waltermeyer v. Hazlewood*, 136 F.4th 361, 367–68 & n.4 (1st Cir. 2025) (distinguishing *Brooks*, 131 F.4th at 614–15); see also *Bulger v. Hurwitz*, 62 F.4th 127, 138 (4th Cir. 2023) ("Even if [the plaintiff] could make out a claim for an alleged failure to provide constitutionally adequate medical treatment, a lack of competent medical care did not cause [the plaintiff's] death[,]" thus constituting a "meaningful difference").

According to the majority, these differences are but a "variation on a theme" that we already rejected in *Brooks*, *ante*, at 11–13, but this stretches *Brooks* far beyond its facts. To be sure, in *Brooks* we found the length of time prison medical staff failed to treat an acutely ill prisoner and the fact that he did not die more pertinent to the merits than to context. *Brooks*, 131 F.4th at 615. And, as we recognized, all prison medical care implicates resource constraints. *Id.* at 615–16. But this doesn't mean the nature of the medical condition and its treatment are irrelevant to the context of a *Bivens* claim. Because prison medical facilities are generally designed to treat

occasional, acute illnesses, the long-term management of chronic conditions necessarily involves substantial non-medical considerations beyond those incident to emergency treatment. Stacy L. Gavin, *What Happens to the Correctional System When a Right to Health Care Meets Sentencing Reform*, 7 NAELA J. 249, 254–55 (2011). For example, because prisons do not traditionally house specialists or diagnostic and testing equipment, chronically ill prisoners in need of these services frequently must be seen by offsite providers. *Id.*; see also Douglas C. McDonald, *Medical Care in Prisons*, 26 Crime. & Just. 427, 443 (1999). And because prisoners must be transported and monitored by armed guards at all times, these visits generate significant costs and risks on top of the need to schedule and pay for the care itself. Gavin, *supra*, at 255.

The majority points out that the defendants in *Carlson* had mismanaged the prisoner's asthma long before the attack that led to his death. *Ante*, at 12. But while the attack was precipitated by this period of negligence, the undeniable core of the claim in *Carlson* pertained to the total failure to administer proper treatment for a life-threatening medical emergency. Thankfully, unlike the prisoners in *Carlson* and *Brooks*, Watkins's condition never came close to endangering his life. Instead, his claim is cabined to the prison's insufficient management of a chronic, non-emergent condition. Specifically, he complains that MCC medical staff conservatively treated him with pain medication and did not arrange a follow-up appointment with the outside physicians that performed his hernia operation before his transfer. In other words, Watkins asks us to wade into a dispute involving scheduling and administrative considerations that were absent in *Carlson*.

The majority dismisses this concern, assuming that the Court in *Carlson* must have anticipated judicial scrutiny of prison administration. *Ante,* at 12. This misses the mark. Of course *Carlson* "approved of some intrusion into the functioning of federal prisons." *Sargeant v. Barfield*, 87 F.4th 358, 367 (7th Cir. 2023). The question is whether a "claim threatens to intrude in ways *Carlson* did not contemplate." *Id.* In this case, Watkins's claim directly implicates broader issues within the prison healthcare system—namely, how prisons must contract, schedule, and coordinate appointments with outside providers. This is a factual distinction that "might alter the cost-benefit balance that justified an implied damages remedy" in *Carlson*, creating a new context. *Snowden*, 72 F.4th at 244. Acknowledging this factual difference is not an attempt to "smuggle" a potential defense into the pleading stage. *Ante*, at 16 (quoting *Brooks*, 131 F.4th at 616). On the contrary, the majority's decision to ignore it threatens to interfere with prison operations in ways *Carlson* did not anticipate.

Second, Watkins's injuries arose in a different context than the prisoner in *Carlson*. As a pretrial detention center, the MCC is an inherently transitory facility. Indeed, during the relevant period for his Eighth Amendment claim, Watkins was facing an imminent transfer to a permanent facility. By contrast, the prisoners in *Carlson* and *Brooks* were housed in permanent prison facilities without any scheduled transfers when their claims arose. The majority diminishes these differences, since theoretically all federal prisoners are subject to transfer at any time. *Ante*, at 11. But the abstract possibility of a transfer is a far cry from Watkins's impending placement in a permanent prison. And, importantly, detention centers such as the MCC face a unique set of challenges given the type and number of detainees they house on a temporary basis.

*Marquez v. Rodriguez*, 81 F.4th 1027, 1031 (9th Cir. 2023) (describing how "jails and prisons are operated differently" because "[j]ails are typically smaller than prisons, they are not intended for long-term detention, and they house a different class of inmates").

To bolster its position, the majority argues that *Carlson* already accounted for this type of policy consideration because the defendants there kept the prisoner in a particular facility against medical advice. *Ante*, at 13. But the comparison is unavailing. In this case, defendants operated out of an entirely transitory facility and, accordingly, had to balance any decisions regarding follow-up consultations, appointments with off-site providers, and long-term care against the administrative and logistical realities of Watkins's fast-approaching transfer to a new facility. Any claim in this context therefore requires us to "factor in a sensitive mixture of things we are ill-positioned to assess," as it "invariably implicate[s] housing policies" and transfer decisions particular to Watkins's transitory situation. *Sargeant*, 87 F.4th at 367. The policy considerations at stake here are thus separate and distinct from those bearing on the decision in *Carlson* to *not* transfer a particular prisoner from his long-term placement.

At minimum, Watkins asks us to interfere with prisons in ways that *Carlson* did not contemplate. *See id.* But I am even more concerned by the systemic implications of recognizing a cause of action for these sorts of claims. It is impossible, at this juncture, to know exactly how the majority's decision will impact the operation of pretrial detention centers and their relationship to the rest of the BOP. This uncertainty is particularly troubling given the prevalence of chronic conditions in the prison population. AmeriHealth Administrators, The

Challenge of Correctional Health Care 2 (2015) (estimating that approximately 40% of all prisoners report at least one serious chronic medical condition). We simply "cannot predict the 'systemwide' consequences of recognizing a cause of action" under these circumstances. *Egbert*, 596 U.S. at 493 (quoting *Ziglar*, 582 U.S. at 136); see also *Goldey v. Fields*, 606 U.S. __, 2025 WL 1787625, at *2 (2025) (declining to recognize a *Bivens* cause of action for an Eighth Amendment excessive-force claim because it "could have negative systemic consequences for prison officials and the 'inordinately difficult undertaking' of running a prison") (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). This "uncertainty alone is a special factor that forecloses relief." *Egbert*, 596 U.S. at 493. Congress, rather than the judiciary, is far "better equipped" to fashion a remedy given these competing considerations. *Id.* at 492.

Appellate courts continue to struggle with the Court's limited guidance on how to conduct a "new context" analysis. In practice, whether a given cause of action proceeds depends largely on what differences are meaningful to a particular panel of judges. The result has been a flood of inconsistent case law across and within circuits.[*] In my view, today's decision adds to this growing discordance. Despite our mandate not to, it extends *Carlson* to a new context that risks further

---

[*] For instance, despite its permissive stance on the nature and extent of the injury for *Carlson* claims, the Fifth Circuit requires a near exact factual match in the Fourth Amendment *Bivens* context. Compare *Carlucci v. Chapa*, 884 F.3d 534, 536–38 (5th Cir. 2018), with *Oliva v. Nivar*, 973 F.3d 438, 442–43 (5th Cir. 2020). And while the Tenth Circuit considers the severity of the injury and type of treatment when assessing *Carlson* suits, it finds the presence of a warrant and location of arrest insignificant for *Bivens* actions. Compare *Rowland*, 121 F.4th at 1243, with *Logsdon v. U.S. Marshall Serv.*, 91 F.4th 1352, 1357–58 (10th Cir. 2024).

encroachment on legislative and executive functions. *Egbert*, 596 U.S. at 493. Mindful that "our watchword is caution," *Hernández*, 589 U.S. at 101, I disagree with the majority's decision to take this risk.

## II

As for Watkins's FTCA claim, I agree with my colleagues that de novo review is appropriate because it was dismissed for failing to state a claim under Federal Rule of Procedure 12(b)(6). Considering this standard, I also agree that dismissal was premature. The statute of limitations is an affirmative defense, so "it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). Watkins was not required to anticipate or overcome it in his complaint, *Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015), nor was he obligated to respond to the government's motion to dismiss with an affidavit or other evidence supporting his request for equitable tolling, *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992). Because his claim is not undisputedly time barred, remand is warranted for further factual development. On a more complete record, the district court can properly decide whether to toll the limitations period under the standard articulated by the majority.

In my view, however, the majority places too heavy a judicial thumb on Watkins's side of the scale. It opines that 36 days is not a facially unreasonable amount of time for Watkins to research and evaluate his legal options, instructs the district court to approach equitable tolling with "flexibility" on remand, and even directs it to "consider the apparent lack of prejudice to the government." *Ante*, at 32–34 (quotation omitted). Equitable tolling is an "extraordinary remedy that

is rarely granted," and it's far from clear whether Watkins can ultimately meet his burden to justify it. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016) (quotation omitted). While I am comfortable sending the claim back for additional fact-finding, we should refrain from "prejudg[ing] the issue" as the majority seems to do. *Hill v. United States*, 762 F.3d 589, 591 (7th Cir. 2014).